

**NUMBER 13-20-00410-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF C.N.L., P.A.L., D.J.L., D.D.L., B.M.L., J.J.L., AND J.J.L., CHILDREN

**On appeal from the County Court at Law No. 1
of Calhoun County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Silva
Memorandum Opinion by Chief Justice Contreras**

This appeal concerns the termination of parental rights to minor children C.N.L., P.A.L., D.J.L., D.D.L., B.M.L., J.J.L., and J.J.L.2.[1] Appellants J.M. and D.L., the children's biological mother and father, respectively, appeal the judgment by five issues. They argue

---

[1] We refer to the children and their family members by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2). We refer to the youngest child, born on August 19, 2019, as J.J.L.2 to differentiate her from her older brother with the same initials.

the trial court erred by: (1) failing to appoint separate appellate counsel for each appellant; (2) finding that termination was in the best interests of the children; (3–4) finding that appellants endangered the children; and (5) finding that appellants engaged in drug use. We affirm.

## I. BACKGROUND

The seven children at issue in this case were born in 2008, 2010, 2013, 2015, 2017, 2018, and 2019. According to the record, in 2006 appellants had their parental rights terminated to four other children, who were born in 2000, 2002, 2004, and 2006. Appellee, the Department of Family and Protective Services (the Department), filed suit on August 21, 2019, seeking immediate removal of the seven children at issue, as well as termination of both appellants' parental rights with respect to those children. A final termination hearing was held on September 16, 2020, at which time the children ranged in ages from one to twelve. Each appellant was represented by separate counsel at trial.

At the time of trial, twelve-year-old C.N.L. was living at Embracing Destiny, a residential treatment center located in Harris County. According to the Department caseworker, C.N.L. was placed there because, while at a previous facility, he hit two children, punched a pregnant staff member in the stomach, and threatened other children and staff members. C.N.L.'s therapist Laniesa Norris testified he is "impulsive," "aggressive towards others," and is "not . . . able to manage his emotions when he becomes upset." Norris stated that C.N.L. was diagnosed with ADHD and that he reported fighting with his siblings when he lived with them. He had aggression and behavior issues when he began treatment but is now taking three medications and is "making progress." When asked why C.N.L. had not yet been transferred to a home placement or foster

home, Norris replied that the child still has anger outbursts and "is still a probation stay within the program." Norris testified that a "very structured" environment is "very, very important" for C.N.L. because he is responding well in that type of environment at the treatment center.

Shawna Bues testified she was J.M.'s probation officer in Calhoun County. J.M. was placed on probation for possession of a controlled substance in 2018. Bues determined that J.M. "absconded" because she made no contact with the probation office for three months. Additionally, J.M. failed to pay probation fees and admitted to using methamphetamine while on probation. As a result, the terms of J.M.'s probation were amended to require her to report to Jefferson County Women's Center, a residential treatment facility in Beaumont. J.M. reported to the facility on October 21, 2019, but "walked out" on January 31, 2020, and was "unsuccessfully discharged." Bues said J.M. did not provide her contact information or address.

D.C., born in 2000, testified that appellants are her biological parents, but she was removed from their custody and placed with relatives when she was a child. Later, she ran away from a foster home because she "wanted a connection with [her] mom." Eventually, when D.C. was around fifteen or sixteen, she was adopted by her maternal grandmother, who allowed her to return to live with appellants. D.C. lived with appellants in a trailer in Seadrift until she was seventeen. The children subject to this suit—aside from C.N.L., who was living with his aunt, and the youngest child, who was not yet born—resided there as well. When she lived with appellants, D.C. observed domestic violence between both appellants, including "hitting" and "throwing things at each other," which caused "physical injuries." She said appellants, in the presence of the children, would "hit

3

each other with a hammer, with sticks, license plates . . . whatever was around at the time, they would just throw them." D.C. said her father would often "try to walk away" but "they were both aggressors." When this violence would occur, D.C. would take her siblings into a separate room or leave the home with them. According to D.C., appellants also would "talk very mean towards each other" and the children would "pick it up." She said that appellants' behavior significantly affected the behavior of the other children. D.C. agreed that she was nervous about testifying because "[i]t's me having to go against my parents to save my siblings."

D.C. stated she once saw her father hit her mother in the head with a hammer, but she said that "he didn't mean to hit her" and that he "felt bad." D.C. also stated that, though she did not see appellants actively using drugs, on "a couple" of occasions she saw needles and spoons on the bathroom counter which "you can tell" were used to consume drugs. She said she would move the paraphernalia so it was out of reach of the children. When asked whether she saw effects of drug use in appellants' behavior, D.C. said that the drug use "would affect [J.M.] a lot, but [D.L.] not so much." She said J.M. would become "paranoid" and "out of her mind" when she was using drugs.

D.C. observed that, when appellants were separated from one another, they generally acted appropriately and "[did] what they should for their children," but when they were together, they would "lose focus of what would mean the most, which was [the children]." They would not cook, clean, bathe, or appropriately dress the children. The trailer would have no running water and smelled of urine. Additionally, the children had "really bad" lice infestations for which appellants did not seek treatment. D.C. said she felt like it was her job to raise and protect her siblings. She believed appellants loved her

4

and the other children, but "[t]hey just don't know how to show it."

In 2019, prior to the time the children were removed from appellants' care, J.M. left four of the children with D.C. They were "very hungry and dirty" but "cried for" their parents. D.C. returned three of them to appellants but kept J.J.L., who was then the youngest child, because "he didn't want to go."[2] She told the Department that J.J.L. needed medical attention because he appeared malnourished. She believed it was in the best interests of all the children to remain in their current placements.

Department investigator Sally Segura testified that she first became involved with the family five or six years prior to trial, when she investigated allegations of physical neglect and drug use by both parents. According to her review of Department records, appellants previously had their rights terminated to their other children due to drug use. In June of 2019, she investigated a report that one of the children had a cigarette burn on her face; however, she was unable to make contact with appellants before "the burn was gone." Segura later spoke to appellants' neighbors, who reported seeing "some altercations" between appellants in the front yard with the children present, including D.L. chasing J.M. with a hammer and choking her. The trial court allowed this testimony over D.L.'s counsel's hearsay objection.

Segura agreed that the Department has removed the children from appellants' care on multiple occasions, including in June 2019. The children were most recently removed on August 20, 2019, one day after J.J.L.2 was born, because both J.M. and the child's meconium testified positive for methamphetamines. When Segura made contact

---

[2] The Department's petition and the final judgment state that J.J.L., born on April 24, 2018, is female. However, the trial record—including witness testimony and photographic exhibits—reflects that he is male.

with J.M. at the hospital, J.M. "started yelling" and told Segura there was a court order requiring Segura to stay away from her and the children. Segura later found out this was not true. The next day, when Segura came to take possession of J.J.L.2 pursuant to an emergency court order, D.L. said "that's been taken care of," believing Segura was referring to the previous case. D.L. then "said some choice words" and Segura testified she "couldn't talk to him anymore after that." Segura stated she could not attempt to place the children with extended family because J.M. refused to talk to her.

Christine Manning, another Department investigator, testified that she sought to make contact with appellants at their residence in June 2019, but J.M. "was very upset and told me to get off her property." About a week later, D.C. asked Manning to take J.J.L. to the hospital because of an untreated wound on his foot and because he "was on the smaller side." In August 2019, Manning accompanied Segura to the hospital to make contact with J.M. after J.J.L.2 was born. Manning said that J.M. was yelling at Segura and demanding a different investigator, but J.M. did not want to speak with Manning either.

Manning said that, before J.J.L.2's meconium was tested, the baby was first administered a "regular drug screen" which returned a negative result. She testified that meconium testing "goes a little further back on a drug screen" than a urinalysis. Manning agreed with J.M.'s counsel that, if a "regular drug screen" comes back negative, then "there's not much in the system . . . at that specific time."

Julia Fuentes testified she is the daughter of J.M.'s first cousin and has been caring for B.M.L. and J.J.L.2 since November 20, 2019. She lives with her wife and the children in a three-bedroom house in Victoria. She does not have a social relationship with either appellant. When B.M.L. came into her care at the age of two, he did not talk, had

6

attachment issues, and was not yet toilet trained. He has "c[o]me a long way," however, and now regularly attends preschool and "talk[s] like a grown person." Fuentes testified B.M.L.'s social skills have dramatically improved, and he enjoys going with Fuentes to visit her relatives. Fuentes stated that J.J.L.2 was "always sick" and both children had upper respiratory problems when they first came into her care. However, she took both children to the doctor and they have improved. J.J.L.2 attends daycare while Fuentes and her wife are working. Fuentes said that B.M.L. sometimes calls her "Mommy" and that she has a strong bond with both children.

Fuentes testified that, the day before her testimony, she and D.C. were waiting outside the courthouse when she observed D.L. and J.M.'s mother "speaking very loudly" and "saying they were going to . . . find something on [D.C.] and deal with it tomorrow, which is today." She understood that to mean "they were going to take care of [D.C.]," which she thought was very inappropriate. Fuentes opined that it was not in the best interests of the children to have frequent contact with appellants because of "the other kids and how they're doing and how they act after visits and stuff."

Monica Salinas testified that she is foster mother to P.A.L., D.J.L, and D.D.L., who were age nine, seven, and five, respectively, at the time of trial. She lives with the children and her mother in a house in Houston. Upon coming into her care on November 20, 2019, all three children were in "bad condition," with "really big behavior problems." They did not know how to bathe or dress themselves, they had "severe" issues with toilet training, they would "touch inappropriate parts" of themselves and their siblings, and they would "say not appropriate things for kids." P.A.L. had problems with sleeping, focusing, and controlling her urination, and she would hit her siblings. D.J.L. had hallucinations and

7

would hear voices, including one telling her to "kill her sister with a knife" and others telling her to stab her brothers with a pencil. These hallucinations occurred "[m]ultiple times" before she started taking medication. D.D.L. had problems with bowel incontinence and would get "anxious" and "destroy" things like clothes and toys. Salinas said D.D.L. reported hearing voices telling him to do those things. The children's behavior would become worse after visits with appellants. The children are all now in counseling and are taking medications prescribed by a psychiatrist, which has helped them become "a little more calm" and to "focus a little bit more." They do not express a desire to see appellants.

Christian Martinez, J.M.'s cousin, testified that he is the caregiver for J.J.L., who was two years old at the time of trial. When he began caring for the child on November 20, 2019, the child "couldn't talk" and "would eat really fast and like he wasn't getting enough." He now attends the same daycare as his siblings B.M.L. and J.J.L.2, where he is doing "very well" and has improved his social skills. Martinez agreed that J.J.L. is now "developmentally on target."

Martinez stated he never personally saw appellants engage in violence or drug use, but he agreed that they have a "reputation" in the community for "[b]ad parenting," drug use, and fighting. He once visited appellants when they had the children; he did not see any drug paraphernalia, but he observed that all of the children needed diaper changes. Martinez said appellants repeatedly contacted him asking if he was going to claim J.J.L. as a dependent for tax purposes or if he had obtained a stimulus check for the child. Both appellants visited sporadically with the child, but they eventually stopped attending, although D.L. attended more visits than J.M.

Beth Wyant, the Department caseworker, testified she was assigned to the case

8

in September of 2019. She prepared a single service plan for both appellants addressing the issues of drug use and domestic violence. J.M. completed a psychological evaluation, but she did not complete a drug and alcohol assessment, parenting program, or individual counseling as required by the service plan. Since exiting the residential treatment center, J.M. missed about four or five scheduled visits with the children, though she behaved appropriately during the visits she did attend. Further, though Wyant asked J.M. to submit to drug tests "[a]t least ten times" over the course of the case, J.M. has not completed any drug tests.

Wyant testified that D.L. attended visits, but failed to complete a psychological evaluation, drug and alcohol assessment, parenting class, batterers intervention, or individual counseling, all of which were required by the service plan. Further, like J.M., he failed to submit to any drug testing, despite being asked "22 times" to do so. According to Wyant, appellants maintained their relationship throughout the case, which she knew because they traveled to the visits together and referred to their home as "our home."

Wyant stated that P.A.L. reported appellants would fight and choke each other and the child would get scared. P.A.L. told Wyant that D.L. once threw a hammer at J.M.; another time, he tried to run her over with his car. Wyant further testified that D.L. has an extensive criminal history: he was convicted of forgery in 1999, possession of cocaine in 2009, assault causing bodily injury in 2009, and driving while intoxicated with a child in 2012. According to Wyant, C.N.L. and P.A.L. want to live with D.C., D.J.L. wants to be placed with Martinez, and D.D.L. wants to be placed with either Martinez or Fuentes.

D.L. testified he is self-employed in construction and has been living in a two-bedroom house in Victoria since five or six days prior to trial. He conceded that he did not

9

inform the caseworker of his new address. Since the start of the case, he has also lived in Goliad, Port O'Connor, and Seadrift. D.L. stated he finished nine out of ten parenting classes—missing one because of the pandemic—and he believed the classes improved his parenting skills. He said the children living in foster care in Houston are "having hard times" and "hate it over there." He denied that J.J.L. was undernourished or that the children have problems with hallucinations, hearing voices, or toilet training. He agreed that if he had custody of the children, the misbehavior would "[s]top immediately." D.L. testified "[t]here's nothing wrong" with C.N.L. other than his ADHD diagnosis.

D.L. stated that J.M. is his common-law wife and that she was incarcerated at the beginning of trial, but that he had bonded her out on the day of his testimony. He said the children have never been exposed to drugs in his house, and he denied that J.M. used methamphetamine before J.J.L.2's birth. He believed she tested positive because she received an epidural during the delivery. He said "overall, [J.M.]'s a good mom." He denied threatening D.C. outside the courthouse. D.L. also denied that he ever had a positive urinalysis drug test while he was on probation.

J.M. testified that she failed to complete the program in Jefferson County because she was accused of bringing contraband into the facility and was ordered to take additional classes at her expense; she denied the accusation and refused to pay. She said she failed to drug test because Bues never told her the address of where to get tested. J.M. denied that she ever failed a urinalysis drug test, and she denied that D.L. ever hit or choked her. She alleged that P.A.L. was coerced to lie about the hammer incident. She pleaded with the court not to "take my children away from me."

As to both appellants, the trial court found predicate grounds for termination under

10

parts (D), (E), (O), and (P) of family code § 161.001(b)(1), and it found that termination was in the best interests of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (1)(E), (1)(O), (1)(P), (2). The trial court ordered both appellants' rights terminated and designated the Department as permanent managing conservator for all seven children. This appeal followed.

## II. SEPARATE APPELLATE COUNSEL

By their first issue, appellants argue that the trial court erred by failing to appoint separate appellate counsel for each appellant. Appellants ask that we abate the appeal, remand for appointment of new appellate counsel for J.M., and permit current counsel to file an amended brief pertaining only to D.L.

The record reflects that on September 28, 2020, eleven days after the conclusion of the trial, a hearing was held during which the trial court granted a motion to withdraw filed by D.L.'s trial counsel. At the hearing, D.L. testified he was unable to afford an appellate attorney "that's any good" and he agreed that he was asking the court "to appoint an attorney for [himself] and [J.M.]" for purposes of appeal. Later, when asked whether he wanted the court to appoint an attorney for himself and his wife, D.L. replied: "I need an attorney really bad." The trial court found that D.L. was indigent and therefore entitled to court-appointed appellate counsel. It later signed an order appointing appellate counsel but failing to state whether counsel was appointed to represent D.L., J.M., or both. The record does not show that J.M.'s trial counsel moved to withdraw, nor does it show that J.M. or her trial counsel appeared at the September 28, 2020 hearing. However, appointed appellate counsel filed an amended notice of appeal on behalf of both

appellants, and has filed a brief with this Court on behalf of both appellants.[3]

Indigent parents in parental termination cases are entitled to appointed counsel, including for appeal. *See id.* §§ 107.013(a)(1), .016(3); *In re P.M.*, 520 S.W.3d 24, 26 (Tex. 2016) (per curiam). "Not only must a parent be allowed to appeal the termination of his or her parental rights, but that appeal must be meaningful." *In re S.K.A.*, 236 S.W.3d 875, 890 (Tex. App.—Texarkana 2007, no pet.). The trial court may appoint a single attorney to represent both parents in a termination proceeding if "the interests of the parents are not in conflict and that there is no history or pattern of past or present family violence by one parent directed against the other parent." TEX. FAM. CODE ANN. § 107.013(b). This statute "implicitly provides that indigent parents who face termination of their parental rights in the same suit are entitled to nonconflicted counsel." *In re B.L.D.*, 113 S.W.3d 340, 346 (Tex. 2003). In determining whether there is a conflict that would preclude the appointment of a single attorney for both parents, the trial court "must determine whether there is a substantial risk that a lawyer's obligations to one parent would materially and adversely affect his or her obligations to the other parent." *Id.* at 347. And "[i]n evaluating whether there is a substantial risk of a conflict of interest before trial, the trial court should consider the available record to determine the likelihood that the parents' positions will be adverse to each other." *Id.*

Appellants argue that J.M.'s "ability to have a meaningful appeal has been compromised by the trial court's failure to appoint her appellate counsel separate and apart from the counsel appointed to represent [D.L.]." They observe that, in his opening

---

[3] Before filing the brief, counsel filed a Motion to Abate Appeal asking us to remand the cause and direct the trial court "to appoint an attorney to prepare and argue a Motion for New Trial for Appellants, due to the failure to counsel to offer exculpating evidence." We denied the motion. Counsel did not seek the appointment of separate appellate counsel for each appellant prior to filing the joint appellants' brief.

statement at trial, D.L.'s trial counsel opined that the evidence was "much more against the mom and not as much against the dad." However, they do not otherwise explain how or why either appellant has been deprived of a "meaningful" appeal. *See In re S.K.A.*, 236 S.W.3d at 890. Specifically, appellants do not argue that there is a "substantial risk" that appellate counsel's obligations to one appellant would "materially and adversely affect" her obligations to the other. *See In re B.L.D.*, 113 S.W.3d at 346. They do not argue that their positions are adverse to each other. *See id.* And they do not cite any authority establishing that a conflict necessarily exists, for purposes of representation on appeal, merely because the evidence is stronger against one parent than it is against the other. *See* TEX. R. APP. P. 38.1(i) (requiring an appellant's brief to include "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

We note that, because there was evidence of domestic violence between J.M. and D.L., the trial court's appointment of a single attorney to represent both appellants on appeal arguably contravenes the statute. *See* TEX. FAM. CODE ANN. § 107.013(b). Nevertheless, neither appellant objected to the appointment at the trial court level, on any ground.[4] *See* TEX. R. APP. P. 33.1(a)(1) (regarding preservation of error). Moreover, appellants have never argued—either before the trial court or on appeal—that the appointment of single counsel violates § 107.013(b). *See* TEX. R. APP. P. 47.1 (providing that we "must hand down a written opinion that is as brief as practicable but that

---

[4] Initially, appellants each filed their own notice of appeal requesting "that the Court appoint a different attorney to represent me in my appeal." It is not clear whether "different attorney" was intended to mean an attorney other than that parent's appointed trial counsel, or an attorney other than the other parent's appointed appellate counsel. In any event, appointed appellate counsel later filed an amended notice of appeal on behalf of both appellants, which omitted the request for a "different attorney."

13

addresses every issue raised and necessary to final disposition of the appeal"). Instead, appellants argue only that the single appointment deprived J.M. of a meaningful appeal. That argument is unavailing for the reasons set forth above. Accordingly, we overrule appellants' first issue.

## III. EVIDENTIARY SUFFICIENCY

Appellants argue by their third and fourth issues that the trial court erred by finding clear and convincing evidence of grounds for termination under parts (D) and (E) of family code § 161.001(b)(1). They argue by their fifth issue that the trial court erred by finding clear and convincing evidence of grounds for termination under part (P) of that statute, concerning drug use. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(P).[5] Appellants do not challenge the trial court's findings under part (O), concerning failure to comply with a court order. *See id.* § 161.001(b)(1)(O).[6]

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *see* TEX. FAM. CODE ANN. § 161.001(b)(1). Therefore,

---

[5] Part (P) permits termination if the parent

used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and: (i) failed to complete a court-ordered substance abuse treatment program; or (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(P).

[6] Part (O) permits termination if the parent

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

*Id.* § 161.001(b)(1)(O).

we do not address appellants' fifth issue, regarding findings under part (P). *See* TEX. R. APP. P. 47.1.

However, the Texas Supreme Court has held that sufficiency of the evidence supporting endangerment under § 161.001(b)(1)(D) or (E) must always be reviewed when challenged on appeal, regardless of whether the evidence supporting termination under another statutory ground is sufficient. *In re N.G.*, 577 S.W.3d at 234, 237 (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights" on endangerment grounds because an endangerment finding "becomes a basis to terminate that parent's rights to other children" under § 161.001(b)(1)(M)); *see In re L.G.*, 596 S.W.3d 778, 781 (Tex. 2020) (per curiam); *In re C.W.*, 586 S.W.3d 405, 507 (Tex. 2019) (per curiam); *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam); *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(M). Accordingly, even though appellants do not dispute the sufficiency of the evidence to support termination under part (O), we must still review the sufficiency of the evidence supporting the endangerment findings under parts (D) and (E).

## A. Applicable Law and Standard of Review

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi—Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases.").

Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. The court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child. *Id.* § 161.001(b)(1), (2).

In their brief, appellants cite only the standard of review applicable to factual sufficiency challenges. Thus, we construe these issues as challenging the factual sufficiency of the evidence supporting the findings. When reviewing the factual sufficiency of the evidence supporting termination, we ask "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder

could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Under the factual sufficiency standard, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam); *see also In re C.H.*, 89 S.W.3d at 26 ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

## B. Endangerment

To establish grounds for termination under part (D), the Department was required to show by clear and convincing evidence that each appellant "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Under part (E), the Department had to show by clear and convincing evidence that each appellant "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

"Endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Danger to a child need not be established as an independent proposition and may be inferred from parental

17

misconduct. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Endangerment under part (D) arises when the child's environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *In re V.A.*, 598 S.W.3d 317, 328 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *In re I.D.G.*, 579 S.W.3d 842, 850 (Tex. App.—El Paso 2019, pet. denied); *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi–Edinburg 1993, no writ). It is not necessary that the Department show the child's environment directly threatened or injured the child. *See In re M.M.*, 584 S.W.3d 885, 889 (Tex. App.—Amarillo 2019, pet. denied). Termination under part (D) may be based on a single act or omission. *See id.* at 889–90; *In re J.E.M.M.*, 532 S.W.3d 874, 884 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re E.M.*, 494 S.W.3d 209, 221–22 (Tex. App.—Waco 2015, pet. denied). Termination under part (E), on the other hand, "requires a voluntary, deliberate, and conscious course of conduct by the parent" and must be based on more than a single act or omission. *See In re P.W.*, 579 S.W.3d 713, 726 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The acceptability of living conditions and parental conduct in the home are subsumed in the endangerment analysis. *See In re V.A.*, 598 S.W.3d at 328; *In re J.E.M.M.*, 532 S.W.3d at 880–81; *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston

18

[14th Dist.] 2014, no pet.). Likewise, "inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under part (D). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

D.C. testified that, when she lived with appellants and the children, appellants would physically fight and throw objects at each other. On one occasion, D.C. saw D.L. hit J.M. in the head with a hammer. P.A.L. recounted this incident to Wyant, as well as another occasion when D.L. tried to run J.M. over with his car. A neighbor also reported to Segura that they saw D.L. chase J.M. with a hammer and choke her. J.M. denied that D.L. chased her or hit her with a hammer.

According to D.C., when appellants were together, they would neglect the children's hygiene and would fail to feed the children adequately. She said the family's home lacked running water and smelled of urine. When D.C. took possession of four of the children in 2019, they were "very hungry and dirty" and J.J.L. appeared malnourished. Martinez stated that, when he visited appellants, all of the children needed diaper changes.

Drug use has consistently been a problem in the household, particularly with respect to J.M. A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the children's well-being. *In re J.O.A.*, 283 S.W.3d at 345. Appellants previously had four children removed because of their drug use, and their parental rights to those children were terminated. D.C. stated that appellants would leave drug paraphernalia within reach of the children. She stated

19

that J.M. would go "out of her mind" when using drugs, though D.L.'s behavior was not affected as much. When J.J.L.2 was born, J.M. tested positive for methamphetamine, as did the child's meconium. D.L. denied that there was drug use in the home.

We conclude that, from the evidence set forth, a rational trier of fact could have formed a firm belief or conviction that both appellants (1) knowingly placed the children or allowed the children to remain in an endangering environment, and (2) engaged in conduct which endangered the children or knowingly placed the children with persons who engaged in such conduct. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). When viewed in light of the entire record, the contrary evidence is not so significant as to preclude these findings. *See In re J.F.C.*, 96 S.W.3d at 266. Though appellants generally denied engaging in domestic violence and drug use, it would not have been unreasonable for the trial court to disbelieve this testimony. *See In re J.P.B.*, 180 S.W.3d at 573. Accordingly, the evidence was factually sufficient to support the endangerment findings as to both appellants. Appellants' third and fourth issues are overruled.

## C. Best Interests

By their second issue, appellants argue the trial court erred by finding termination of their parental rights was in the children's best interests.

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Factors that we consider in determining whether termination of parental rights is in a child's best interest include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties

seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking termination is not required to prove all nine *Holley* factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27.

As to the first *Holley* factor, Wyant testified that C.N.L., age twelve, wants to live with his older sister D.C.; P.A.L., age nine, wants to live with D.C. or another family member; D.J.L., age seven, was upset when she was removed from appellants and now wants to be placed with Martinez; and D.D.L., age five, wants to be placed with Martinez or Fuentes. Fuentes said B.M.L. was excited and happy to see D.L. during visits. According to D.C., J.J.L., age two, did not want to go back to appellants after spending time in D.C.'s care in 2019. Finally, J.J.L.2, age one, is too young to have credibly expressed a preference.

As to the second *Holley* factor, the record reflects that the children have special needs. C.N.L. was diagnosed with ADHD and, at the time of trial, was housed at a residential treatment center because of previous violent behavior. C.N.L.'s therapist said he is impulsive, aggressive, and unable to manage his emotions. Though he is improving, he still has anger outbursts and requires a "very structured" environment. Salinas testified that P.A.L. had problems with sleeping and focusing, while D.J.L. and D.D.L. had violent auditory hallucinations. All three children in Salinas's care have "severe" issues with

21

incontinence and using the toilet. Salinas said these problems would get worse after visits with appellants. She agreed that P.A.L., D.J.L., and D.D.L. require "constant adult supervision" to ensure they do not engage in inappropriate touching with each other. Martinez stated that J.J.L. "couldn't talk" when he took custody of the child; Fuentes testified that B.M.L. also would not talk initially, though he does now. Fuentes said that J.J.L.2 was frequently sick and that both B.M.L. and J.J.L.2 had upper respiratory infections. Consideration of this factor weighs in favor of termination.

Relevant to the third and eighth *Holley* factors is the evidence discussed above concerning endangerment, including testimony that appellants fought and threw objects at each other, occasionally failed to feed the children, neglected the children's hygiene, and engaged in drug use. Especially noteworthy is the fact that neither appellant submitted to drug testing during the course of this case, despite being requested to do so by Department representatives on numerous occasions. The trial court could have inferred from this evidence that appellants were using drugs. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) ("The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs."). Further, Martinez testified that, when appellants inquired about the child in his care, they did so only because they were interested in obtaining the financial benefits attendant to caring for a child. This evidence indicates that the existing parent-child relationship is not proper, and it supports a finding that the children would be exposed to an additional risk of danger should they be reunited with appellants. *See Holley*, 544 S.W.2d at 372. Thus, consideration of these factors weighs in favor of termination.

22

As to the fourth and fifth *Holley* factors, appellants did not demonstrate that they had the parenting abilities necessary to properly care for the children. D.C. stated that appellants generally acted appropriately with the children when they were not with each other, but Wyant provided uncontroverted testimony that appellants continued to maintain their relationship throughout the case. The trial court could have determined from this testimony that appellants were extremely likely to maintain their relationship should their rights not be terminated. Moreover, neither appellant completed a parenting program or individual counseling as required by their service plan, which was adopted as a court order. D.L. additionally failed to complete a batterers intervention program as required by the plan. Consideration of these factors weighs in favor of termination.

As to the sixth and seventh factors, D.C. opined that the children should remain in their current placements. C.N.L. is progressing at the residential facility, and his therapist stated that he needs to remain in a very structured environment. P.A.L., D.J.L., and D.D.L. are also improving, with the help of medication and therapy, while in Salinas's care. According to Martinez, J.J.L. is doing "very well" in his care and is developmentally on track for his age. There was evidence that B.M.L. and J.J.L.2 are improving their social skills and have a strong bond with their caretaker, Fuentes. On the other hand, neither appellant demonstrated an ability to maintain stable housing or employment. Even though the four oldest children are not currently residing in a potentially permanent placement, consideration of this factor weighs in favor of termination.

As to the final *Holley* factor, J.M. testified that she did not drug test for the Department because her probation officer did not tell her where to take the tests, whereas D.L. testified he did not drug test because he was too busy. However, Wyant testified she

asked J.M. to submit to drug testing at least ten times and D.L. twenty-two times during the course of the case, but appellants did not comply. J.M. said she did not complete the parenting class because she was ordered to attend the treatment program in Jefferson County.

As noted, D.L. denied that the children suffer from hallucinations, incontinence problems, or malnourishment. And appellants both denied domestic violence and drug use. But the trial court, as trier of fact in this case, was the exclusive judge of the credibility of the witnesses, and we must defer to its determinations so long as they are reasonable. *See In re J.P.B.*, 180 S.W.3d at 573. We cannot say that it would be unreasonable for the trial court to discredit appellants' denials. Considering the entire record, we conclude that a rational trier of fact could have formed a firm belief or conviction that termination of appellants' rights to all seven children was in the children's best interests. Appellants' second issue is overruled.

## IV. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
18th day of February, 2021.

24